IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | 8:12-CR-430 |
| vs. | |
| JAMES CHRISTOPHER VALIMONT, | MEMORANDUM AND ORDER |
| Defendant. | |

This matter is before the Court on the defendant James Christopher Valimont's Motion to Suppress (filing 15) and the Findings and Recommendation and Order (filing 24) of United States Magistrate Judge F.A. Gossett. The order incorporated the findings made by Judge Gossett at the hearing on Valimont's motion, *see* filing 27 at 149–64, and recommended that the motion to suppress be denied. Also before the Court is Valimont's objection to the Magistrate Judge's order (filing 29). The Court has conducted a de novo review of Valimont's motion to suppress, pursuant to 28 U.S.C. § 636(b)(1). For the reasons discussed below, the Court finds Valimont's objection is without merit, adopts the findings of the Magistrate Judge, and denies Valimont's motion to suppress.

**FACTUAL BACKGROUND**

The Magistrate Judge accurately summarized the facts of this case in his findings, read into the record at the hearing on Valimont's motion to suppress, so the Court will provide only a brief summary. *See* filing 27 at 149–58. The Magistrate Judge heard testimony from Nebraska State Patrol Trooper Jared Jacobsen, who conducted the traffic stop that resulted in Valimont's arrest, and from Valimont, and reviewed a video recording of the stop taken from Jacobsen's cruiser. While Jacobsen and Valimont agree on many of the basic details, they offered conflicting accounts of several key points.

**A. Jacobsen's Testimony**

On November 18, 2012, Nebraska State Patrol was operating a ruse drug checkpoint at the I-80 exchange near Bradshaw, Nebraska. Filing 27 at

17. Approaching the (non-existent) checkpoint, several signs warned eastbound drivers on I-80 that they were approaching a State Patrol drug checkpoint. Filing 27 at 18–19. The signs were placed such that the only exit available before the supposed checkpoint was a rural exit with no advertised services or rest areas. Filing 27 at 17–18.

Trooper Jared Jacobsen was parked in a hidden location adjacent to the eastbound off-ramp. Filing 27 at 20, 62. Jacobsen testified that he would wait for vehicles to take the exit, and then pull them over if they committed a traffic violation. Filing 27 at 18. At around 9:57 a.m., Jacobsen observed yellow Penske rental truck exit the Interstate. Filing 27 at 20, 80–81. Jacobsen saw the truck stop at the end of the off-ramp, signal a right turn, and then proceed south on a county road. After a short distance, the truck executed a U-turn and headed back toward the Interstate. As the truck headed north toward the eastbound on-ramp, Jacobsen began driving toward the same intersection on the off-ramp, in order to observe the truck. Filing 27 at 21, 71. Jacobsen testified that he saw the truck turn onto the on-ramp without signaling a turn. Filing 27 at 24. Jacobsen stated that he had a clear view of the truck the entire time following its U-turn and that it never signaled the turn back onto the Interstate. Filing 27 at 23–25, 58, 84, 92–93. Jacobsen activated his emergency lights and pulled the truck over for violating Neb. Rev. Stat. § 60-6,161, which requires drivers to use a turn signal continuously for at least 100 feet before turning. *See also United States v. Adler*, 590 F.3d 581 (8th Cir. 2009).

Jacobsen exited his cruiser and contacted the driver and sole occupant of the truck, Valimont. Filing 27 at 28–29. At Jacobsen's request, Valimont handed over his license and the rental agreement for the truck. Jacobsen testified that he asked Valimont if he was lost, and that Valimont responded that he had exited because he had received a series of texts and phone calls. Filing 27 at 29. According to Jacobsen, Valimont stated that was on his way from Arizona to see his daughter in Iowa, and that he was using the truck to transport some used furniture to her. Filing 27 at 30–31. Jacobsen observed that the truck appeared "lived in," noting that it contained several duffle bags and a half-eaten burrito. He also noticed that Valimont had two cell phones in the car. Filing 27 at 31, 43. Jacobsen asked Valimont to exit the vehicle and join him in his cruiser to complete some paperwork, and Valimont agreed. Filing 27 at 31. Before Valimont entered the cruiser, Jacobsen frisked him for weapons and found none. Filing 27 at 59.

Valimont sat in the front, passenger seat of the cruiser (in other words, not in the caged portion) and was not handcuffed. Filing 27 at 32–33, 41. Jacobsen ran a criminal records check on Valimont and began the process of issuing a warning for the traffic violation. Filing 27 at 32–34. While he was

- 2 -

doing this, he asked Valimont if he had a criminal record, about his travel, and again asked why he had exited the Interstate. Valimont again answered that he had needed to use his cell phone. Filing 27 at 34–35.

At that point, Jacobsen advised Valimont that carrying less than an ounce of marijuana was only an infraction in Nebraska and normally not an arrestable offense. Filing 27 at 35. Jacobsen explained that this was normal practice when speaking with someone pulled over at a ruse checkpoint. Valimont denied having any drugs in the vehicle. Jacobsen then told Valimont that there were several reasons why people exited after seeing the ruse signs: because they were driving impaired, had a warrant, or were carrying drugs. Jacobsen testified that he then "went into detail about sometimes those drugs or narcotics are small amounts and sometimes they're larger amounts." Filing 27 at 36. And, according to Jacobsen, Valimont responded that he did not have any drugs in the truck, and that Jacobsen was free to search it. Filing 27 at 36. Jacobsen asked if Valimont meant he could search the truck for drugs, and, according to Jacobsen, Valimont again agreed. Filing 27 at 37. Jacobsen observed that when he asked Valimont if he had any drugs in the truck, both his hands began to shake. Filing 27 at 38–39.

Around that time, Jacobsen completed the warning paperwork and had received the results of the records check, which showed only a previous domestic violence offense. Filing 27 at 37. Jacobsen testified that he then returned Valimont's license and rental agreements and advised him the stop was concluded. Filing 27 at 37, 46, 107–08. Jacobsen then asked for and received Valimont's permission to search the truck. Filing 27 at 38. Throughout their conversation Jacobsen maintained a calm, conversational tone. Filing 27 at 44. In total, approximately 18 minutes had elapsed from the initial stop to this point. Filing 27 at 31, 46, 66–67, 91–92, 123.

Jacobsen began to search the truck, but then decided it was safer to first move Valimont to the rear of the patrol car. Valimont moved to the rear without objection. Filing 27 at 41–42. Upon searching the cargo hold of the truck, Jacobsen discovered several large bales of marijuana. Filing 27 at 47.

Jacobsen then returned to the cruiser and advised Valimont he was under arrest. Filing 27 at 47. Valimont was read his *Miranda* rights, handcuffed, and returned to the rear of the cruiser. Filing 27 at 47–48, 93. Jacobsen then drove Valimont to the York County Jail in York, Nebraska. Jacobsen did not question Valimont during the ride, but made some polite conversation. Filing 27 at 48–49. In addition to the drugs found in the truck, Jacobsen found approximately $3,000 on Valimont's person. Filing 27 at 49.

### B. Valimont's Testimony

Valimont presented a starkly contrasting account of the traffic stop. He explained that he initially pulled over because he had received texts from both his daughter and ex-wife, and wished to read them. Filing 27 at 115–16. Valimont testified that when he was headed back to the Interstate, he did activate his turn signal, and did so at least 100 feet from the on-ramp. Filing 27 at 117–18. He remembered this because there was a sign about 100 feet from the on-ramp, and because he has since returned to the road and measured the distance himself. Filing 27 at 118–19.

Valimont also presents a very different account of his interactions with Jacobsen. Although many of the basic details of their encounter are the same, he testified that Jacobsen was not polite and conversational but spoke to him like a "drill sergeant," and that Jacobsen was only polite after Valimont was arrested and the audio recording turned on. Filing 27 at 123, 140–41. Valimont denies telling Jacobsen he was taking furniture to his daughter in Iowa, as his daughter lives in Arizona and has never been to Iowa. He did, however, admit that he told Jacobsen he was taking furniture to Iowa. Filing 27 at 129–30, 133, 136. More importantly, Valimont denies that he ever consented to the search of the truck. Filing 27 at 125. Instead, Valimont testified that Jacobsen repeatedly questioned him about drugs, and repeatedly *told* Valimont that he could search the vehicle for anything illegal. Filing 27 at 125–27. And, Valimont stated, Jacobsen did not *ask* for his consent, but told him that if he was not doing anything illegal then Valimont would not mind if Jacobsen searched the truck. Filing 27 at 126–27, 130–31.

Finally, Valimont testified that he was never told he was free to go or that the stop was concluded. Filing 27 at 127–28. And, he claims, his driver's license and registration were never returned to him. Filing 27 at 121, 124–25, 137. As such, he testified, he did not feel free to leave at any time during the stop. Filing 27 at 128–29.

### C. The Video Recording

A recording of the traffic stop was made by a camera in Jacobsen's cruiser and has been submitted by both parties. Filing 27 at 26–27. The Court has carefully reviewed the video recording. The recording contains no audio, because on the morning of the stop, Jacobsen forgot to activate the microphone attached to his uniform. Filing 27 at 26–27. The video shows Valimont's truck approaching the Interstate on-ramp, and clearly shows that he failed to signal his turn.

A second recording was made that depicts the inside of Jacobsen's cruiser. This recording shows the ride from the site of the traffic stop to the York County Jail. The audio is available for this recording. Jacobsen

explained that he manually turned on the audio, pursuant to his department's policy. Filing 27 at 108. During the ride, Jacobsen and Valimont can be heard conversing politely. At one point, Jacobsen informs Valimont that he would hold on to the rental agreement, and would make a copy of Valimont's license, and then return it. Exh. 1, Second Video, at 11:40. In the video, Jacobsen can be seen holding both.

### D. The Warrant for Valimont's Cell Phones

Following Valimont's arrest, the Nebraska State Patrol sought and received a warrant to search the two cell phones seized from Valimont. *See* Exh. 7. The affidavit in support of the search warrant described the traffic stop and stated that in addition to the two cell phones, law enforcement seized 101 bundles of marijuana, weighing over 2,000 pounds, along with approximately $3,000 in United States currency. Exh. 7 at 1–2. The affiant also stated that, in his experience, drug offenders often kept records related to their illegal activities and distribution networks on their phones. Exh. 7 at 2.

### ANALYSIS

At the hearing before the Magistrate Judge, Valimont raised several arguments: (1) that there was no reasonable suspicion to support the traffic stop because Valimont did, in fact, properly signal his turn; (2) the stop was unduly prolonged beyond the time needed to complete the necessary questioning and paperwork, and Jacobsen did not possess reasonable suspicion of any criminal activity sufficient to prolong the stop; (3) Valimont did not, in fact, consent to any search, and any consent given was not voluntary; (4) that Valimont was placed under the functional equivalent of arrest and should have been read his *Miranda* rights; (5) that the warrant lacked probable cause; and (6) that the ruse checkpoint violated the Due Process Clause of the Fourteenth Amendment and the Interstate Commerce Clause.

The Magistrate Judge rejected each of these arguments. First, the Magistrate Judge found that Jacobsen was the more credible witness, and that his testimony, together with the video tape, established that Valimont did not use his turn signal. This provided probable cause for the traffic stop. Filing 27 at 156–58. Next, the Magistrate Judge found that the stop was not unduly prolonged. Filing 27 at 159–60, 162. The Magistrate further found that Valimont did consent to the search, that this consent was voluntary, and that he was not placed under arrest prior to this such that Jacobsen was obligated to read him a *Miranda* advisory. Filing 27 at 158–63. Additionally, the Magistrate found that even if the initial stop had been unduly prolonged,

Valimont's act of consent purged any taint flowing from that violation. Filing 27 at 160. The Magistrate found that probable cause supported the warrant, and that if it did not, the warrant nonetheless fell under the *Leon* good-faith exception. Finally, the Magistrate Judge found that the ruse checkpoint passed constitutional muster. Filing 27 at 156, 161–62. Valimont objects to each of these findings and renews his earlier arguments. The Court finds no merit to any of Valimont's arguments and adopts the findings of the Magistrate Judge.

First, this Court agrees that Jacobsen was the more credible witness. The Court has carefully reviewed the video of the stop, and finds that, if Valimont had in fact used a turn signal, it would have been visible on the video. This confirms Jacobsen's statements and exposes Valimont's lack of veracity. Valimont points to a later portion of the second video recording where, after arriving at the York County Jail, Jacobsen can be seen holding Valimont's license and rental agreement, and tells Valimont he will return the license after making a copy. Valimont claims that this shows Jacobsen in fact never returned these documents.

The Court does not view this portion of the video as contradicting Jacobsen's testimony that he did, in fact, return these documents before conducting the search of Valimont's truck. Filing 27 at 37, 46, 107–08. The video is just as readily reconciled with Jacobsen's version of events. Apparently, at some point after conducting the search and placing Valimont under arrest, Jacobsen again confiscated these documents.[1]

The Court likewise finds that Jacobsen had adequate grounds to stop Valimont's vehicle. The video and Jacobsen's testimony establish that Valimont failed to properly use his turn signal. This traffic violation provided probable cause for the stop. *United States v. Hollins*, 685 F.3d 703, 706 (8th Cir. 2012).

A traffic stop can become unlawful if it is prolonged beyond the time reasonably necessary to complete its purpose. *Id.* But that did not happen here. During a traffic stop, an officer may detain the occupants of the vehicle while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation. *United States v. Bowman*, 660 F.3d 338, 343 (8th Cir. 2011). These include asking for the driver's

---

[1] It would certainly have simplified matters if Jacobsen had testified to this. As it stands, the record is silent on *how* the documents came to be in Jacobsen's possession again. There is conflicting evidence before the Court on *whether* the documents were returned. On one side is Valimont and a video susceptible to multiple interpretations. On the other is Jacobsen. The Court, having concluded that Jacobsen was the more credible witness, finds that Valimont's documents were, in fact, returned to him prior to his consenting to the search, and that they were confiscated again at some point thereafter.

- 6 -

license and registration, as well as inquiring about his destination, route, and purpose. *Id.* If complications arise during these routine tasks, the vehicle may be detained for a longer period of time. *Id.* Whether a traffic stop is reasonable in length is a fact-intensive question, and there is no per se time limit. *Id.*

Here, from the time of the initial stop to when Jacobsen asked for and received Valimont's consent to search, approximately 18 minutes had passed. This was not unreasonable under the circumstances. *See, e.g., Bowman,* 660 F.3d at 343–44. Any extension of the stop that resulted from Jacobsen's questions or statements regarding drug activity was *de minimis*, and did not transform the stop into an unlawful seizure. *United States v. Coleman,* 700 F.3d 329, 335–36 (8th Cir. 2012).

And in any event, an officer may expand the scope of a traffic stop if he develops reasonable suspicion that criminal activity is afoot. *Id.* at 335. Reasonable suspicion requires a particularized and objective basis for suspecting criminal activity. *Id.* Factors consistent with innocent travel, when taken together, can give rise to reasonable suspicion, even though some travelers exhibiting those factors will be innocent. *United States v. Carpenter,* 462 F.3d 981, 986 (8th Cir. 2006). Jacobsen observed several factors that, when taken together, provided reasonable suspicion that Valimont was transporting contraband.

First, regardless of whether Valimont was transporting furniture to his daughter or simply to Iowa, Jacobsen rightly found the story to be less than credible. Filing 27 at 43–44. Second, Jacobsen observed that the truck appeared "lived in," noting that it contained several duffle bags and a half-eaten burrito, which he noted can be a sign that a driver is carrying a time-sensitive load. He also noticed that Valimont had two cell phones in the car. Filing 27 at 31, 43. Jacobsen observed that when he asked Valimont if he had any drugs in the truck, both of his hands began to shake. Filing 27 at 38–39. Finally, Valimont exited the Interstate at a non-serviceable, rural exit, immediately before the ruse checkpoint. Once stopped, Valimont's behavior was also inconsistent with his story that he had pulled off the road to read text messages or make a telephone call. Taken together, these facts established reasonable suspicion. *See, e.g., Bowman,* 660 F.3d at 345; *Carpenter* 462 F.3d at 986–87.

The Court next finds that Jacobsen was not required to administer *Miranda* warnings to Valimont at any time prior to his actual arrest following the search. Although a motorist is technically seized during a traffic stop, *Miranda* warnings are not required where the motorist is not subjected to the "functional equivalent" of a formal arrest. *Coleman,* 700 F.3d at 336. While he was questioned, Valimont was seated in the front seat of Jacobsen's

- 7 -

cruiser and was not handcuffed. He was not told his detention would be anything other than temporary. Jacobsen asked Valimont reasonable and limited questions in an unthreatening tone. Under the totality of the circumstances, this did not amount to restraints comparable to those of a formal arrest. *See id.*

The Court next finds that Valimont's consent to the search was voluntarily and freely given. The government bears the burden of proving voluntary consent by a preponderance of the evidence, and must show that on the totality of the circumstances the officer reasonably believed the search was consensual. *United States v. Lopez-Mendoza*, 601 F.3d 861, 866 (8th Cir. 2010). In evaluating the reasonableness of this belief, the Court considers a number of factors, including the suspect's age, intelligence, and education, whether he was under the influence of drugs or alcohol, whether he was informed of his right to withhold consent, and whether he was aware of rights afforded criminal suspects. *Id.* The Court also considers the environment in which the alleged consent took place, specifically (1) the length of time he was detained; (2) whether the police threatened, physically intimidated, or punished him; (3) whether the police made promises or misrepresentations; (4) whether he was in custody or under arrest when the consent was given; (5) whether the consent occurred in a public or secluded place; and (6) whether he stood by silently as the search occurred. *Id.*

Having reviewed these factors, the Court finds the consent was voluntarily given. At the time of the search, Valimont was 56 years old. There is no evidence his thinking was impaired. He had not been detained for long, and there is no evidence he was threatened or physically intimidated into consenting, nor did Jacobsen make any promises or misrepresentations. Valimont was not in custody when he was asked to consent to a search—his license and registration had been returned to him and he had been told he was free to leave. There was only one officer present, and Valimont was on the side of a public road in the daylight. And even before Valimont was asked to give consent, he voluntarily offered to allow Jacobsen to search the truck. It is true that Jacobsen did not obtain written consent, nor did he tell Valimont that he did not have to consent. Filing 27 at 99. However, neither of these steps were required. *United States v. Saenz*, 474 F.3d 1132, 1136–37 (8th Cir. 2007); *United States v. Vera*, 457 F.3d 831, 835 (8th Cir. 2006)

The Court next finds that the warrant for the search of Valimont's cell phones was supported by probable cause. When the affidavit supporting the search warrant sets forth facts sufficient to create a fair probability that evidence of a crime will be found in the place to be searched, probable cause exists. *United States v. McArthur*, 573 F.3d 608, 613 (8th Cir. 2009). Here, the affidavit described the affiant's training and experience in drug

investigations, the nature of the traffic stop, and the fact that the cell phones were seized from Valimont together with over 2,000 pounds of marijuana and approximately $3,000 in cash. And the affiant stated that, in his experience, drug offenders often kept records relating to their activities and distribution networks on their phones. This more than established the necessary probable cause.

Lastly, the Court rejects Valimont's argument that the ruse checkpoint itself violated his Fourth Amendment rights, as well as the Due Process Clause of the Fourteenth Amendment and the Interstate Commerce Clause. There is no Fourth Amendment violation where a driver is stopped at a ruse checkpoint only after committing a traffic violation. *United States v. Prokupek,* 632 F.3d 460 (8th Cir. 2011).

Valimont's arguments regarding the Interstate Commerce Clause are confusing. He argues that the ruse checkpoint somehow involved an overextension of federal authority, such that the federal government had impermissibly exercised a plenary police power not authorized by the Constitution. *See, e.g.*, *United States v. Lopez,* 514 U.S. 549, 566 (1995). But Valimont has not pointed to any actions by federal officials—the ruse checkpoint and his arrest were entirely the result of actions by state officials. Finally, Valimont makes no actual argument in support of his due process claim. The Court declines to address arguments raised in such a cursory fashion.

In short, all of Valimont's arguments are without merit, and the Court will adopt the findings and recommendation of the Magistrate Judge and deny Valimont's motion to suppress. Accordingly,

IT IS ORDERED:

1. The Court adopts the Magistrate Judge's Findings and Recommendation and Order (filing 24) and overrules Valimont's objection to the same (filing 29); and

2. Valimont's motion to suppress (filing 15) is denied.

Dated this 13th day of May, 2013.

BY THE COURT:

John M. Gerrard
United States District Judge